**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Samuel Neumann,<br><br>           Plaintiff,<br><br>vs.<br><br>Michael J. Astrue, Commissioner of Social Security Administration,<br><br>           Defendant. | No. CV-12-08100-PCT-NVW<br><br>**ORDER** |

      Plaintiff Samuel Neumann seeks review under 42 U.S.C. § 405(g) of the final decision of the Commissioner of Social Security Administration ("the Commissioner"), which denied him supplemental security income under section 1614(a)(3)(A) of the Social Security Act. Because the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence and is not based on legal error, the Commissioner's decision will be affirmed.

**I.    BACKGROUND**

    **A.    Factual Background**

      Neumann was born in January 1987. He was initially diagnosed as having obsessive-compulsive disorder, attention deficit hyperactivity disorder, and learning disabilities, but more recently has been diagnosed Asperger's syndrome and anxiety disorder.

      He graduated from high school in Omaha, Nebraska, in 2005 and completed the equivalent of a couple of years of college in Iowa and Arizona. He has never been

employed or paid for his work, but he did participate in a church volunteer program painting houses and has worked at his father's office filing and shredding documents. He participated in a "job shadowing" program at the Bent River Machine Shop where he observed machinists. Near the end of the program he was permitted to run a machine, but he did not properly load it and caused a thousand dollars of damage. Beginning in December 2008, Neumann participated in machinist training at the Maricopa Skills Center, but in January 2010 he was dropped from the program because of insufficient attendance.

### B. Procedural History

On March 24, 2008, Neumann protectively applied for supplemental security income benefits, alleging disability beginning January 1, 2007. On September 8, 2010, he appeared with his attorney and testified at a hearing before the ALJ. A vocational expert also testified.

On December 16, 2010, the ALJ issued a decision that Neumann was not disabled within the meaning of the Social Security Act. The Appeals Council denied his request for review of the hearing decision, making the ALJ's hearing decision the Commissioner's final decision. On May 24, 2012, Neumann sought review by the Court.

## II. STANDARD OF REVIEW

The district court reviews only those issues raised by the party challenging the ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). The court may set aside the Commissioner's disability determination only if the determination is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Substantial evidence is more than a scintilla, less than a preponderance, and relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole. *Id.* In determining whether substantial evidence supports a decision, the court must consider the record as a whole

and may not affirm simply by isolating a "specific quantum of supporting evidence." *Id.* The ALJ is responsible for resolving conflicts in medical testimony, determining credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). As a general rule, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted).

### III. FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To determine whether a claimant is disabled for purposes of the Social Security Act, the ALJ follows a five-step process. 20 C.F.R. § 416.920(a). The claimant bears the burden of proof on the first four steps, but at step five, the burden shifts to the Commissioner. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the ALJ determines whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). If so, the claimant is not disabled and the inquiry ends. *Id.* At step two, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment. § 416.920(a)(4)(ii). If not, the claimant is not disabled and the inquiry ends. *Id.* At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Pt. 404. § 416.920(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id.* If not, the ALJ proceeds to step four. At step four, the ALJ assesses the claimant's residual functional capacity and determines whether the claimant is still capable of performing past relevant work. § 416.920(a)(4)(iv). If so, the claimant is not disabled and the inquiry ends. *Id.* If not, the ALJ proceeds to the fifth and final step, where he determines whether the claimant can perform any other work based on the claimant's residual functional capacity, age, education, and work experience.

§ 416.920(a)(4)(v).  If so, the claimant is not disabled.  *Id.*  If not, the claimant is disabled.  *Id.*

## IV. ANALYSIS

At step one, the ALJ found that Neumann has not engaged in substantial gainful activity since March 24, 2008, the application date for benefits.  At step two, the ALJ found that Neumann has the following impairments which are severe when considered in combination:  a mild form of Asperger's syndrome and an anxiety disorder.  At step three, the ALJ determined that Neumann does not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

At step four, the ALJ determined that Neumann "has the residual functional capacity to perform light, unskilled, simple work that does not require interaction with the general public" and has no past relevant work.  At step five, the ALJ concluded that, considering Neumann's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform.

Neumann challenges the ALJ's findings at the steps four and five.  He contends that the ALJ's residual functional capacity determination and finding that Neumann's subjective symptom testimony is not entirely credible are not supported by substantial evidence.

### A. The ALJ Did Not Err in Weighing Medical Source Evidence.

#### 1. Legal Standard

In weighing medical source opinions in Social Security cases, the Ninth Circuit distinguishes among three types of physicians:  (1) treating physicians, who actually treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant.  *Lester v.*

- 4 -

*Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, more weight should be given to the opinion of a treating physician than to the opinions of non-treating physicians. *Id.* Where a treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons, and where it is contradicted, it may not be rejected without "specific and legitimate reasons" supported by substantial evidence in the record. *Id.* Moreover, the Commissioner must give weight to the treating physician's subjective judgments in addition to his clinical findings and interpretation of test results. *Id.* at 832-33.

Further, an examining physician's opinion generally must be given greater weight than that of a non-examining physician. *Id.* at 830. As with a treating physician, there must be clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician, and specific and legitimate reasons, supported by substantial evidence in the record, for rejecting an examining physician's contradicted opinion. *Id.* at 830-31.

The opinion of a non-examining physician is not itself substantial evidence that justifies the rejection of the opinion of either a treating physician or an examining physician. *Id.* at 831. "The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." *Thomas*, 278 F.3d at 957. Factors that an ALJ may consider when evaluating any medical opinion include "the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; [and] the specialty of the physician providing the opinion." *Orn*, 495 F.3d at 631.

The Commissioner is responsible for determining whether a claimant meets the statutory definition of disability and does not give significance to a statement by a

medical source that the claimant is "disabled" or "unable to work." 20 C.F.R. § 416.927(d).

### 2. Medical Source Evidence
#### a. Patricia Wicks, Ph.D., Treating Psychologist

On December 11, 2006, when Neumann was moving from Omaha, Nebraska, to Clarkdale, Arizona, Dr. Wicks summarized the results of multiple assessments that she had administered to Neumann. She diagnosed Neumann with obsessive compulsive disorder and possible Asperger's syndrome and schizotypal personality disorder. She recommended "brief, focused treatment" during Neumann's "initial transition to a new geographical and psychological home."

#### b. Joel Fick, Ph.D., Examining Specialist in Neuropsychological Testing

On January 20, 2007, Dr. Fick administered multiple assessments to Neumann during a seven-hour testing session. He concluded that Neumann was suffering from three co-occurring conditions that seemed to be impacting his academic functioning: a mild form of Asperger's syndrome, obsessive-compulsive disorder by history, and attention deficit hyperactivity disorder (inattentive type). Dr. Fick also concluded that Neumann appeared to have learning disorders affecting his auditory processing, reading comprehension, and spelling skills because his performance in these areas was lower than would be expected with his above-average level of intelligence. Dr. Fick recommended that Neumann be provided with strategies and skills to specifically deal with his learning disorders and that he seek assistance for disabled students in college, such as extra time for tests and reduced distractions during examinations. Dr. Fick also recommended that Neumann continue individual and co-occurring family therapy to help him deal with stress associated with learning and being successful in school:

> For example, parents often place high expectations of [] academic success on their children. It may be possible that Sam needs to be praised for his effort as opposed to his

- 6 -

> achievement to alleviate the internal stress that seems to be present based on past reports of OCD. Additionally, individual therapy could teach stress management skills such as diaphragmatic breathing and other relaxation techniques to prevent stress from deleterious effects.

### c. Stephen Gill, Ph.D., Examining State Agency Psychological Consultant

On June 30, 2008, Dr. Gill performed a psychological evaluation at the request of the state agency. He also reviewed the assessments by Dr. Fick and Dr. Wicks and the April 19, 2008 third-party function report by Neumann's mother. He diagnosed Neumann as having autism spectrum disorder, Asperger's type, not otherwise specified. He opined that Neumann is capable of self-managing his own funds and that:

> The patient, in consideration of OCD issues and issues of mutual reciprocity affecting his social contacts, is in a position to learn and implement a simple repetitive task in the appropriate working environment that would be supportive of the differences in his social interactions.

### d. Brady Dalton, Psy.D., State Agency Reviewing Consultant

On July 28, 2008, Dr. Dalton reviewed Neumann's medical records and completed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique. Dr. Dalton found no evidence of limitation regarding Neumann's ability to remember locations and work-like procedures, understand and remember very short and simple instructions, understand and remember detailed instructions, carry out very short and simple instructions, and carry out detailed instructions. Dr. Dalton assessed Neumann as not significantly limited in his ability to sustain an ordinary routine without special supervision, make simple work-related decisions, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. Dr. Dalton assessed Neumann

as moderately limited in his ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Dr. Dalton did not find Neumann to be markedly limited in any area.

In comments elaborating on his assessments, Dr. Dalton stated that Neumann "appears to have a fair ability to sustain attention throughout extended periods of time (up to 2 hours at a time)," "appears to have a fair ability to perform at a consistent pace particularly if he is engaged in a simple to semi-skilled task," and "appears to have an adequate ability to maintain [a] regular schedule." These comments addressing areas for which Dr. Dalton assessed Neumann's ability as moderately limited indicate that Dr. Dalton did not interpret "moderately limited" as precluding all work.

     **e.**  **David Yandell, Ph.D., State Agency Reviewing Consultant**

On November 28, 2008, Dr. Yandell reviewed and affirmed Dr. Dalton's assessment and conclusion that Neumann is able to perform simple and complex job tasks and would be best placed in a work setting that does not require a great deal of social interaction.

     **f.**  **Mark Wellek, M.D., Treating Physician**

On January 29, 2010, Dr. Wellek wrote to Neumann's attorney for the purpose of documenting his Social Security claim:

> I first saw Mr. Neumann in January 2008. It was clear at the outset that he suffered from High Level Autism and screening

- 8 -

>testing (enclosed) confirmed that. He had never been treated for his disorder. Instead, other examiners did the usual and mistaken thing and treated him (unsuccessfully) for Attention Deficit Hyperactivity Disorder. The medication provided to him for that only served to agitate him. Rather than work with him behaviorally (to talk with people, to manage his own tantrums) he simply got unhelpful medicine.
>
>At present, I am allowed to see Sam infrequently. I have just been notified that he has been dropped from a skills training program for nonattendance. His prognosis is guarded. He is prescribed Effexor XR 225mgm per day.
>
>He is unable to care for himself independently and is disabled in nearly every sense of the word.

Dr. Wellek said that Neumann's chart would not be provided for reasons of privacy. The screening testing described as enclosed is not included in the administrative record, and Dr. Wellek did not provide any assessment of Neumann's work-related abilities.

### 3. The ALJ's Residual Functional Capacity Determination

In his opening brief, Neumann contends that the ALJ erred by determining he "has the residual functional capacity to perform light, unskilled, simple work that does not require interaction with the general public" because it does not include all of the moderate limitations[1] found by Dr. Dalton. In his reply brief, Neumann contends that the ALJ relied too much on Dr. Dalton's assessment, which was prepared in July 2008, before Neumann's training at the Maricopa Skills Center was terminated for insufficient attendance.

---

[1] Neumann contends that because the rating "Moderately Limited" on the Mental Residual Functional Capacity Assessment means greater limitation than the rating "Not Significantly Limited," "Moderately Limited" means significantly limited. Regardless of the scope that "significantly" could encompass in other contexts, here "Moderately Limited" means more than "Not Significantly Limited" and less than "Markedly Limited." It does not mean that the claimant has no ability in the specific area.

- 9 -

First, the ALJ did not err in weighing the medical source evidence. He properly rejected Dr. Wellek's conclusory statement that Neumann is disabled, which is a determination reserved to the Commissioner. He also did not err by finding that no persuasive evidence of record supported Dr. Wellek's conclusory statement that Neumann is "unable to care for himself." He assigned "significant evidentiary weight" to Dr. Fick's and Dr. Gill's assessments, to the extent indicated in the ALJ's assessment. The ALJ also assigned significant evidentiary weight to Dr. Dalton's and Dr. Yandell's opinions and assessments, specifically that Neumann is able to perform simple and complex job tasks and would be best placed in a work setting that does not require a great deal of social interaction. The medical source evidence to which the ALJ assigned significant weight is uncontradicted by other medical sources except for Dr. Wellek's conclusory statements that were properly rejected.

Second, the ALJ was not required to determine that Neumann's residual functional capacity was severely limited merely because he determined that Neumann had impairments that were severe when considered in combination. The ALJ's residual functional capacity determination does not conflict with Dr. Dalton's assessment that Neumann has moderate limitations in his ability to maintain attention and concentration and perform at a consistent pace, but he appears to be able to sustain attention for up to two hours at a time and appears to be able to perform at a consistent pace, particularly if he is engaged in a simple to semi-skilled task. Further, the ALJ's residual functional capacity determination reflects Dr. Dalton's opinion that Neumann is moderately limited in interacting appropriately with the general public. And, despite a moderate limitation in his ability to maintain a regular schedule, Dr. Dalton opined that Neumann appeared to have an adequate ability to maintain a regular schedule.

Finally, the ALJ did not err by failing to give controlling weight to Neumann's unsuccessful experience at the Maricopa Skills Center from December 2008 through

January 2010. The only medical source evidence after Neumann began training at the Maricopa Skills Center is the January 29, 2010 letter from Dr. Wellek, which stated that he was "allowed to see Sam infrequently." The ALJ was not required to conclude that Neumann's inability to maintain regular attendance at the Maricopa Skills Center demonstrated conclusively that he would not be able to maintain regular attendance at a job under different circumstances.

        **B.    The ALJ Complied with the Social Security Administration's Program Operations Manual System DI 25020.010.**

Nuemann contends that the ALJ failed to comply with the Social Security Administration's Program Operations Manual System DI 25020.010 by concluding that he "is capable of making a successful adjustment to work in jobs that exist in significant numbers in both the regional and national economies" when Dr. Dalton found him to be moderately limited in his ability to maintain attention and concentration for extended periods and commented that Neumann "appears to have a fair ability to sustain attention throughout extended periods of time (up to 2 hours at a time)." The Social Security Administration's Program Operations Manual System DI 25020.010(B)(2)(a) includes among the "mental abilities needed for any job" "the ability to maintain concentration and attention for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure)." DI 25020.010(B)(3)(d) states that to perform unskilled work the claimant must show the ability to "maintain attention for extended periods of 2-hour segments (concentration is not critical)." Dr. Dalton's use of the phrase "fair ability" indicates he believed that Neumann has adequate ability to sustain attention for up to 2 hours at a time. Thus, the ALJ's residual capacity determination does not conflict with the Social Security Administration's Program Operations Manual System DI 25020.010.

- 11 -

**C.     The ALJ Did Not Err in Evaluating Neumann's Credibility.**

In evaluating the credibility of a claimant's testimony regarding subjective pain or other symptoms, the ALJ is required to engage in a two-step analysis: (1) determine whether the claimant presented objective medical evidence of an impairment that could reasonably be expected to produce some degree of the pain or other symptoms alleged; and, if so with no evidence of malingering, (2) reject the claimant's testimony about the severity of the symptoms only by giving specific, clear, and convincing reasons for the rejection. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).

First, the ALJ found that Neumann's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms. Second, the ALJ found Neumann's statements regarding the intensity, persistence, and limiting effects of the symptoms not credible to the extent they are inconsistent with the ALJ's residual functional capacity assessment. The ALJ found Neumann's statements not credible to the extent he claims he is unable to work due to his impairments and their related symptoms because the medical evidence does not support Neumann's allegation.

On April 18, 2008, Neumann reported that his daily activities were housework and running errands. He said that he helped care for the family dog by walking her, feeding her, taking her to the vet, and giving her baths. He said that he had no problem with personal care and he did not need help or reminders regarding personal needs, grooming, or taking medicine. He reported that he could prepare one or two course meals and he prepared meals daily. He also reported that he is able to wash dishes, do laundry, and clean bathrooms without assistance. He said that he goes out daily, is able to walk and drive, and is able to go out alone. He reported shopping weekly and running errands when needed. He said that he is able to read and listen to audio books, use the internet, play video games, play with the dog, and watch television without problems. He also reported that he attended an autism support group monthly and did not need anyone to

remind him to go or to accompany him. He reported that he does not handle stress well, but handles changes in routine moderately well. He said that he was born with his conditions and there had been no changes in what he is able to do.

At the administrative hearing on September 8, 2010, Neumann testified that he has been diagnosed with Asperger's syndrome, which affects his ability to deal with stress, and when stress builds up, he "will literally shut down" and is not able to do anything. He also testified that he had graduated from high school and had acquired several years of college credit at colleges in Iowa and Arizona. He said that he had applied for jobs, but had never been hired. He had done church volunteer work painting houses. He said that he drives a car, had lived alone in an apartment in Phoenix for one year and four months, and is able to cook and clean for himself.

Neumann also testified that while living alone and enrolled at the Maricopa Skills Center, he was not able to get to class on a regular schedule even though he had an alarm clock and his vocational rehabilitation counselor called him every morning for several weeks. Neumann said that even when he was ready to leave his apartment for the Maricopa Skills Center on time, it was difficult for him to go because of anxiety, and he was "thrown out of the program" because of his lack of attendance.

Neumann contends that the ALJ erred by finding his statements not credible to the extent he claims he is unable to work due to his impairments and their related symptoms because the ALJ did not give proper weight to Neumann's lack of attendance at the Maricopa Skills Center or his mother's personal observations regarding his ability to care for himself. Mrs. Neumann's April 19, 2008 Third-Party Function Report stated that her son needed to be reminded to shave, brush his teeth, and clean the kitchen and bathroom. On April 26, 2010, she wrote that when Neumann was to begin working at the Maricopa Skills Center in December 2008 (at the age of 21), he moved into an apartment two hours away from his parents and "was living on his own for the first time." She reported that

when he did not begin work as scheduled because he said he had the flu, she came to Phoenix and took Neumann to Dr. Wellek, who explained that Neumann likely would be anxious about leaving his apartment on a shortened time schedule and navigating an unfamiliar city in the volume of traffic, the normal "first day" worries would magnify, and his anxiety would worsen as he missed more days.  Mrs. Neumann also opined that Neumann "does not value personal hygiene or cleanliness of his living space":

> He understands why it is important to be clean, and does shower every day, but that is where it ends.  Even as a child it was next to impossible to get him to brush his teeth, trim his nails, or eat foods that will promote lifelong health.  He refuses to brush his teeth, shave, or wear clothes without holes in them, especially if left to his own devices.  His appearance and health deteriorated during his time in Phoenix.  He ate almost exclusively pre-packaged, processed food or fast food.  He gained a large amount of weight and appeared disheveled and unclean. . . .
>
> Since Sam was ten years old, he had the chore of cleaning the kitchen in our house, but it was a struggle every single day to get him to fulfill the expectation of what that meant.  Arguments ensued over the fact that he not only had to empty the dishwasher, but he also had to put all the dishes away.  As we moved Sam into his own apartment, we were very concerned about how he would maintain it.
>
> He engaged in hoarding behavior collecting junk mail, plastic bags, soda bottles, and empty food boxes and cans on all flat surfaces such as counters, tables, and floors.  This paired with refusal to open any windows caused his apartment to smell very stale and unpleasant, which he claimed not to notice.  When asked, Sam indicated his apartment complex had no recycling and he was saving those things to take in.  After a month went by and nothing had been done, I cleaned it out and threw it away.  He was very upset but returned to the behavior when I left and had a new collection by the time I returned.  Occasionally he would bring the recycling 2 hours

- 14 -

> to our home in Clarkdale to dispose of it properly, but he never found a recycling place in Phoenix.
>
> In addition to that instance, Sam consistently demonstrated a lack of initiative with self-sufficiency.  His dishwasher quit working while he lived there.  He was coming home for the weekend, so rather than call his landlord, he brought his dirty dishes home with him.  I explained that he would need to call the landlord and make a report.  He was overwhelmed with the information and asked me to deal with it.  I called the landlord and arranged to have it fixed.  Sometime later, his disposal became clogged and stopped working.  He called me and asked me to take care of it again.  This time, I explained the process and told him that he would have to deal with it.  It took him about two weeks, but he eventually made arrangements and it was fixed as well.
>
> **Since Moving Home**
>
> Sam is less conversational and more standoffish than he was when he left a year ago.  His personal habits have deteriorated significantly and he still makes consistently poor food choices.  He is still not brushing his teeth or shaving.  He has had a very difficult time reintegrating to daily routines of our household including chores and family outings. . . .

The ALJ referred to specific medical evidence in the record and Mrs. Neumann's April 26, 2010 statement as not supporting Neumann's allegation that he is unable to work.  Mrs. Neumann's statement describes a young man who is understandably anxious about living and driving in Phoenix and beginning a new job; does not comply with his mother's preferences for his eating, grooming, and clothing; wants to recycle even when inconvenient; and avoids communication with his parents.  In light of all of the evidence submitted, the ALJ did not err by finding Neumann's testimony not credible to the extent that he alleges that he is not able to perform light, unskilled, simple work that does not require interaction with the general public.

- 15 -

IT IS THEREFORE ORDERED that the final decision of the Commissioner of Social Security is affirmed. The Clerk shall enter judgment accordingly and shall terminate this case.

Dated this 8th day of February, 2013.

*Neil V. Wake*
Neil V. Wake
United States District Judge